FILED

2007 Dec-13  AM 11:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **ANTHONY T. LEE, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff-Intervenor and,** | ) | **CASE NO. CV-70-VEH-251-S** |
| **Amicus Curiae,** | ) | |
| **vs.** | ) | |
| | ) | |
| **MACON  COUNTY BOARD OF** | ) | **CITY OF VESTAVIA HILLS** |
| **EDUCATION, et. al.,** | ) | **SCHOOL SYSTEM** |
| **Defendants.** | ) | **Case No.: 2:06-MC-2265-VEH** |

**MEMORANDUM DECISION**

**FINDINGS OF FACTS**

In compliance with the Court's order of August 8, 2007, doc. 18-1, the settling parties (the City of Vestavia Hills Board of Education and the private Plaintiff class) jointly submit these proposed findings of fact and conclusions of law:

1.      In 1965, a desegregation action was brought against the Jefferson County Board of Education, alleging that it operated a racially segregated school system and requesting entry of an order desegregating the school system. See generally, *Linda Stout, et al. v. Jefferson County Board of Education, et al.*, No. CV 65-396-S.

2.      On April 30, 1970, the City Council of the City of Vestavia Hills, which is located in Jefferson County, voted to establish the City of Vestavia Hills Board of Education, and to operate within the City's limits a school system separate from the one operated by the Jefferson County Board of Education.  Doc. 20, Responses to Plaintiffs' First Interrogatories, no. 24.

3.      Soon thereafter, this Court permanently enjoined the City of Vestavia Hills Board of Education (hereinafter, the Board) – which had yet to admit any students – to operate a desegregated schools system, and towards this end imposed several requirements on the Board. *Stout v. Jefferson County Board of Education*, No. CV 65-396-S (N.D. Ala. July 23, 1970)(order granting permanent injunction). The Court's order said:

> [t]hat Vestavia Hills Board of Education and members thereof be and are hereby permanently enjoined from failing to provide equal educational opportunity to all students residing in the Vestavia Hills system without

regard to race and to take affirmative steps to eliminate all vestiges of the dual system based on race with respect to student assignment, faculties, school construction and site selection, sports, extracurricular activities, and any other school activities.

*Id.* at 2.

4.     In this order the Court imposed other obligations on the Board, including goals for recruiting African American faculty and staff members, and a requirement for the Board to transport and educate children who were residents of the area which the Court identified on a map attached to its July 23, 1970 order, and which the parties refer to as "the Oxmoor Area."[1]   *Id.* The Oxmoor Area was then part of Jefferson County, and was and is geographically separate from the City of Vestavia Hills, both in 1970 and now (although it was annexed into the City of Birmingham in 1988).

5.     The details of the Boards obligations were altered in a series of orders issued later in 1970 and in 1971 (hereinafter collectively, "the terminal desegregation order"), including a requirement for the Board to transport Oxmoor students between the Oxmoor Area and the Board's schools. *Stout v. Jefferson County Board of Education*, No. CV 65-396-S (N.D. Ala. July 30, 1970)(Findings of Fact, Conclusions of Law, and Final Order [sic]) at 19.

6.     There is no evidence to suggest that, for the next 36 years, the Board failed to comply with the obligations imposed by the Court's terminal desegregation order. Twice each year the Board filed with the Court, and served on the private Plaintiffs and the Department of Justice, semi-annual reports of the Board's activities. Over this period, there is no record that the Court, the private Plaintiffs, the Department of Justice, or any member of the public ever asserted or determined that the Board was not doing what the Court ordered it to do.

7.     On September 19, 2006, the Board filed a motion to be declared unitary, to dissolve the Court's permanent injunction, and to dismiss the case against the Board. Doc. 1. The Board also asked the Court to conduct a status conference, which the Court did on October 25, 2006. See doc. 2.

8.     As a result of the status conference, the Court set forth a schedule for the parties to conduct discovery and then, after due consideration of the information produced, to inform the Court whether any party would object to the Board's motion to be declared unitary. Doc.  9, see also doc.  12.

9.     There followed a lengthy period of discovery, during which many thousands of pages of documents were produced to the private Plaintiffs and the

---

[1] Throughout this document, the term "Oxmoor Area" refers to the area depicted on the map that is Attachment V to the *Stout* Court's July 23, 1970 Order.

Department of Justice by the Board in response to their discovery requests. See affidavits of Norman Chachkin, doc. 19, and of Dorman Walker, doc. 20.

10.    During this period, the parties also engaged in private settlement talks, both in person with lawyers and clients present, and by multiple conversations and document exchanges. Counsel for the private Plaintiffs and for the Board have testified that each side initially made proposals that were unacceptable to the other. However, over the course of many months, the settling parties were able to negotiate a settlement agreement. The settlement agreement (as revised on August 7, 2007, *see* infra, ¶12) is attached as the appendix to this Memorandum Decision.

11.    On July 30, 2007, the settling parties moved the Court to approve the settlement agreement. Doc. 16-1. Together with their motion, they filed the proposed agreement,  doc. 16-2, and a letter from the United States stating its opinion that the Board should be declared unitary. Doc. 16-3. After noting that the Board had responded to the government's discovery request, the letter said:

> After reviewing the Board's responses and other information, including census data, it is the opinion of the United States that the Vestavia Hills School District has complied with its desegregation obligations and federal law. Accordingly, the United States has no objection to the Court granting the Board's Motion to Be Declared Unitary, to Dissolve Injunctions, and to Dismiss.

12.    In response to the settling parties' motion, the Court conducted a hearing on August 7, 2007.  See docs. 17 and 18-1.  At the hearing, the Court reviewed the settlement agreement line-by-line with the parties (including the United States, which while not a settling party, was present at the hearing) and informed the settling parties of specific changes in the agreement that would lead the Court to consider approving it.  See doc. 17. The Court also gave its preliminary approval to the agreement (after counsel for the settling parties accepted those suggestions), authorized the Board to fill Oxmoor Tuition Student positions, which are created by the settlement agreement, set a date for a fairness hearing, and instructed the settling parties to advertise the fairness hearing and the settlement agreement. Docs. 17 and 18-1.

13.    In particular, the Court instructed the Board to publish the Court's notice of the proposed settlement and the fairness hearing, doc. 18-2, in local newspapers, on the Board's web site, in the principal's office at each of the Board's schools, at the Vestavia Hills Public Library and the Vestavia Hills City Hall, and at the Board's central office. Id. Copies of the notice also were mailed to the parents of current Oxmoor Area students, and to members and officers of the Ridgeview Neighborhood Association. Id.  In addition to the notice, the Board also was instructed to make available the proposed (revised) settlement agreement, the United States Department of Justice letter dated  July 27, 2007, the Board's motion to be declared unitary, and an Objection/Comment form. The purpose of the form was to allow interested parties to comment on or object to the proposed settlement, and to indicate whether they

wanted to speak at the fairness hearing. The settling parties complied with the Court's order on publication of the notice and settlement agreement, etc. The Court has received no complaint that notice of the settlement agreement and the fairness hearing was inadequate.

14.     The Court received three communications respecting the proposed settlement on or about the deadline for such filings established by the Notice attached to the Memorandum Opinion and Order of August 8, 2007. Doc. 18.  Two of these were on the Objection/Comment forms approved by the Court, and were from families who reside in the Oxmoor Area.  Of these, one, doc. 23, was an objection by Dwight and Zonja Coleman to the proposed settlement, discussed further below, and indicated that they wished to speak at the fairness hearing. The second, doc. 22, was submitted by Willie and Henrietta Leonard, indicated that they would attend the hearing but did not wish to speak, and included no further comment on the settlement or the lawsuit.  The third, doc. 21, was submitted in the form of a hand-delivered letter addressed to the Court on stationery of an organization named "Citizens for Better Schools" located in Birmingham, signed by Mr. Ronald E. Jackson, who was identified as the organization's Executive Director. Mr. Jackson's letter indicated his desire to appear and speak at the fairness hearing.

15.     On October 23, 2007, the settling parties filed a comprehensive response to the two objections. Doc. 28.   In addition, on August 9, 2007, Mr. Norman Chachkin,[2] one of the counsel for the private plaintiffs, filed a declaration in support of the settlement agreement and the Board's motion to be declared unitary. Doc. 19. Attached to the declaration were the interrogatories and request for production served on the Board by the private plaintiffs. Similarly, on August 10, 2007, one of the Board's counsel, Dorman Walker,[3] filed a declaration also supporting the settlement agreement and the Boards motion to be declared unitary. Attached to Mr. Walker's declaration were the Board's responses to the private plaintiffs' interrogatories and document requests, and the United State's first and second interrogatories and document requests.

---

[2]   The Court takes notice of Mr. Chachkin's long and involved history with school desegregation cases, beginning in Little Rock, Arkansas in 1965 and continuing to 2007, including responsibility of supervising and coordinating all school desegregation cases in which the NAACP Legal Defense Fund was involved during the height of the national desegregation effort, from 1969 to 1975, and his tenure as the Legal Defense Fund's Director of Litigation from 1995 to 2007. *Doc. 19.*  In the course of his career, Mr. Chachkin has participated in negotiations leading to the settlement and dismissal of long running  school  desegregation actions. *Id.*

[3]   Mr. Walker's declaration indicates that he has represented public school systems for the past 20 years, and has participated in multiple school desegregation cases.

16.     The fairness hearing was held on October 26, 2007 commencing at 9:00 a.m. The two objectors – the Colemans, and Mr. Ronald Jackson representing the Citizens for Better Schools – spoke in opposition to the proposed settlement agreement. As discussed in detail below, the Colemans did not so much oppose the settlement agreement as they complained they were not getting the full benefit of it, in that their children would be eligible only for Tuition Oxmoor Student positions, and would not be eligible for the free Oxmoor Student positions.  They did not oppose the Board's motion to be declared unitary, and provided no evidence tending to suggest that the Board should not be declared unitary. Mr. Jackson addressed some, but not all, of the generalized objections made in his written submission to the Court, see doc.  21, and as discussed below, the Court finds that his comments are an insufficient basis for disapproving the settlement agreement or withholding a determination that the Vestavia Hills school system is unitary. The only witness who testified was the Vestavia Hills Superintendent of Education, Dr. Jamie Blair. In response to an issue raised by Mr. Johnson, Dr. Blair affirmed and reviewed the Board's successful efforts at Vestavia Hills High School to adopt a new school flag for use at school events, and to eliminate the use of the Confederate flag during school hours and at athletic events conducted on school property.

17.     Turning now to the objections, as indicated, the Court received only two objections to the proposed Settlement Agreement, and to the finding of unitary status that the private plaintiffs and the defendants agreed that the Court should make in this matter if it approved the settlement.  (The United States was not a party to the Settlement Agreement but did not object to its terms.  As noted above, the United States had independently concluded that the City of Vestavia Hills School System was entitled to a declaration of unitary status and vacation of this Court's prior Orders respecting the system.[4])  The Court considers these objections in turn.

---

[4] See Joint Response to Objections of Zonja Coleman and Citizens for Better Schools, *Doc. 28*, at 1-2 n.1.

## The Colemans' Objection

18.     Dwight and Zonja Coleman are African American parents of a child not yet of school age who moved into the Oxmoor Area in 2000.  As indicated in both Mr. Coleman's written objection, and in his and Mrs. Coleman's remarks at the fairness hearing, they understood at the time they moved into the area that any children they had would be able to attend the Vestavia Hills school system, pursuant to the court orders in this matter.  The Colemans did not indicate how they came to have this understanding and specifically did not attribute it to any representation by Vestavia Hills school officials or any counsel involved in this case.

19.     The Colemans' objection goes to specific features of the proposed Settlement Agreement by which the Board agrees to continue to educate a group of children residing in the Oxmoor Area for a finite period of years into the future.[5]  First, the Colemans suggest that they are being treated unfairly as compared to other Oxmoor residents whose children will be entitled to complete their K-12 education in Vestavia Hills schools without payment of tuition.[6]  As their written objection put it,

> "I feel as though my wife and I are being penalized because we did not have a child in the Vestavia Hills School System before this motion was filed, even though we have been living in the Oxmoor Ridgeview community since December 2000. . . . If our child receives a slot, we are still being asked to pay as opposed to our neighbors who have lived in

---

[5]  The parties negotiated these terms because, under the ruling in *Stout v. Jefferson County Bd. of Educ.*, 845 F.2d 1559 (11th Cir. 1988), the fact that the Oxmoor Area was annexed into the City of Birmingham in 1988 appears to deprive this Court of authority to compel the Vestavia system to permanently accept children residing in that area into its schools — with or without the requirement that they pay tuition — as a condition of unitary status and dismissal of this action.  Thus, the Colemans' objection focuses on the compromise reached by the parties as it would affect their child.  (The Court notes that under the agreement, attendance by Oxmoor Area children, like those residing in the City of Vestavia Hills, is explicitly conditioned upon their compliance with generally applicable rules and policies adopted by the Board and the school system administration.)

[6]  Under the settlement, Oxmoor Area students enrolled in Vestavia Hills schools during the 2006-07 school year may complete grades K-12 in the system without paying tuition.  In addition, younger siblings of such students who either were too young to have enrolled in the first grade in the 2006-07 school year, or who become siblings of such students (*e.g.*, by birth, adoption, or parental remarriage) also may enroll in and attend Vestavia Hills schools (without tuition) through the twelfth grade provided that the sibling(s) enroll(s) in the Vestavia Hills system within the six school years commencing with the present, 2007-08, school year.

6

the community for the same amount of time or less"

20.     Second, the Colemans object to the fact that they receive no preference in consideration for the limited number of "tuition slots" available to Oxmoor Area residents who did not have a child enrolled in the Vestavia Hills system during the 2006-07 school year.[7]  (In their written objection, the Colemans argue that "Current residents should be considered [for tuition slots] before future residents of the Oxmoor neighborhood.  The current residents with children that are not of school age are not even guaranteed a slot with the new agreement.")

21.     The Court has carefully considered these objections and, while sympathetic, determines that they do not justify disapproval of the parties' settlement in toto, which is the only course of action open to the Court.  The Court may not rewrite the parties' settlement.  *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1160 (11th Cir. 1983), citing *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1172 (5th Cir. 1978) and *Cotton v. Hinton*, 559 F.2d 1326, 1331-32 (5th Cir. 1977).  Given the fact that the United States' investigation of the circumstances led the government to conclude that the City of Vestavia Hills School System was entitled to a declaration of unitary status and termination of prior court orders — including the orders requiring the system to enroll students living in the Oxmoor Area — and the controlling ruling in *Stout*, *supra n*.6, the settlement reached by the private plaintiffs and the Board clearly benefited the plaintiff class members by enlarging, to some degree, the opportunity to attend Vestavia Hills schools for Oxmoor Area residents, both with and without the requirement of tuition.  Clearly, the Colemans wish that this opportunity had been enlarged even further, so as to include them in the group of families entitled to send children to Vestavia Hills schools without payment of tuition.  The line drawn through the parties' negotiations, however, is neither irrational nor inherently unfair under the circumstances.  To the extent that some Oxmoor Area families are "preferred" over others, the distinction turns on whether the family had a child enrolled in the Vestavia Hills system at the time the parties' settlement terms were finalized at the end of July 2007.  Although the Colemans would rather give priority to families based on the length of time they have resided within the Oxmoor Area, unless the Board agreed to accept a substantially larger number of Oxmoor Area students over the next 12-15 years, this solution would raise the real possibility that a child who had already started in the Vestavia Hills system

---

[7]  In addition to "grandfathering" the attendance of Oxmoor Area pupils who attended Vestavia Hills schools in the 2006-07 school year and their siblings, the settlement makes available up to 30 additional places in the Vestavia Hills system during the six school years commencing with the present, 2007-08, year to other Oxmoor Area children, subject to their payment of tuition, as authorized by Alabama law, *see Phenix City Bd. of Educ. v. Teague*, 515 So. 2d 971 (Ala. Civ. App. 1987).  If there are more applicants than places, participants will be selected by lottery from among the qualified applicants.  For the 2007-08 school year, no lottery was necessary.

might have to withdraw, or that siblings of such a child would have to attend a different school system.  Either possibility would entail substantial burdens on the affected children and their families; the Court accordingly concludes that it is not unfair to the class as a whole, which is the standard for determining whether the settlement should be approved.[8]

22.    The Court similarly finds that the lottery selection feature for selecting among applicants for tuition slots in Vestavia Hills schools if the number of applicants exceeds available places is neither unfair nor a basis for rejecting the parties' settlement.  Again, the Colemans suggest that families be ranked for selection based on the length of time they have resided in the Oxmoor community, but use of such a criterion would be likely to create resentment among other families who, like the Colemans, had little understanding, at the time they moved to Oxmoor, of the factors that would, in the future, determine whether their children would be able to attend Vestavia Hills schools.  The lottery feature places all applicants on the same level and each has an equal chance, determined by the laws of probability, to be selected.

23.    For these reasons, the Colemans' objections do not persuade the Court to disapprove the settlement.

---

[8]  *See, e.g., Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1216 (5th Cir. 1978)("Where there is disagreement among the class members concerning an appropriate course of action, it may be impossible for the class attorney to do more than act in what he believes to be the best interests of the class as a whole."); *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. Unit A 1982) (affirming approval of settlement "granted over the objection of all but one of the eleven named plaintiffs as well as over the objections of a number of class plaintiffs," id. at 1207) and cases cited; *County of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1428, 1435 (E.D.N.Y. 1989) (emphasizing fiduciary responsibility of class counsel to the entire class and concomitant "duty to ignore any special interests of the objecting class representatives in favor of the overall, general interests of the class as a whole," *aff'd in pertinent part*, 907 F.2d 1295, 1325 (2d Cir. 1990).

## Citizens for Better Schools' Objections

24.     Ronald E. Jackson, the Executive Director of "Citizens for Better Schools," appeared and presented evidence and arguments at the fairness hearing. Mr. Jackson stated that the organization is an unincorporated association which has members, but at the present time does not have any members who reside within the Oxmoor Area.  Thus, Mr. Jackson is neither a member of the plaintiff class nor authorized to represent their interests as members of his organization, Citizens for Better Schools (hereinafter, "C.B.S.").  While the Court may have the authority to limit or deny entirely the opportunity for a non-class member to appear at the fairness hearing,[9]  the Court did not exclude Mr. Jackson from the fairness hearing and will consider the objections that he raised in his letter to the Court for whatever merit they may have.

25.     While Mr. Jackson's letter enumerated some fifteen separate bases for C.B.S.'s objection to the settlement, and to a finding of unitary status and dismissal of this action against the Board, he did not speak at the fairness hearing with respect to every one of these grounds.  The Court therefore will describe each of these various bases for the C.B.S. objection based primarily upon the letter delivered to the Clerk's Office by Mr. Jackson, adding descriptions of matters raised by Mr. Jackson at the hearing where that is appropriate.  Preliminarily, however, the Court observes that Mr. Jackson provided few facts or data to support the objections, and did not challenge (at the fairness hearing) the parties' contention that he had not inspected or analyzed the voluminous data about the Vestavia Hills School System's operation that was produced in response to the plaintiff parties' discovery (and much of which has been filed with the Court as exhibits to affidavits of Mr. Chachkin and Mr. Walker, Docs. 19, 20, despite the description of C.B.S. in its written objection letter

---

[9]  Fed. R. Civ. P. 23(e)(1)(A) requires a fairness hearing where, as here, a settlement will terminate a class action by voluntary dismissal or compromise, and Rule 23(e)(4)(A) provides that "Any class member may object to a proposed settlement, voluntary dismissal, or compromise that requires court approval under Rule 23(e)(1)(A)."  Somewhat analogously, the Supreme Court has held that a class member who appeared at a fairness hearing and voiced an objection may appeal a ruling approving the settlement, without separately seeking to intervene in the action in the trial court. *Devlin v. Scardeletti*, 536 U.S. 1 (2002).  However, the Court emphasized that *only members of the class* could take advantage of this opportunity to appeal.  *See id.* at 9, explaining the Court's ruling in *Marino v. Ortiz*, 484 U.S. 301 (1988) (*per curiam*) ("refus[ing] to allow an appeal of a settlement by a group of white police officers who were not members of the class of minority officers that had brought a racial discrimination claim against the New York Police Department") as being based on the fact that "[a]lthough the settlement affected them, the District Court's decision [approving it] did not finally dispose of any right or claim they might have had *because they were not members of the class*" (emphasis supplied).

as "a Birmingham, Alabama based public policy research and advocacy organization" (emphasis added). This materially reduces the utility of C.B.S.'s objections in assisting the Court to evaluate the Vestavia Hills system's entitlement to unitary status.

26.     Changed conditions. C.B.S. asserts that unitary status should be denied because "[c]hanged conditions do not exist to warrant the relief sought." To the extent this is a factual assertion, its relevance to the legal standard that governs this proceeding is unclear. The Board's motion, Doc. 2, is not brought pursuant to Fed. R. Civ. P. 60(b) seeking modification of prior orders in this case. *See Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367 (1992). Rather, it follows the specific procedures applicable to school desegregation actions prescribed by the Supreme Court in *Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237 (1991) and *Freeman v. Pitts*, 503 U.S. 467 (1992). In any event, the only indirect references to this subject made by Mr. Jackson at the fairness hearing concerned his allegations that the Vestavia Hills school system, far from having eliminated the vestiges of the "dual system,"[10] still practices racial discrimination. In other words, this objection merges with the inquiry that the Court must conduct under governing law, and so the Court will not treat it independently.

27.     Non-compliance. This objection states that "[d]efendant school district has not met factually, legally, nor in good faith, the requirements of the existing injunction requiring operation of a non-discriminatory school district." Like the first ground for objection, this objection refers to no specific facts and appears to summarize or incorporate all other bases for objection to which C.B.S. refers in the

---

[10]  In fact, during the long period during which the State of Alabama operated and enforced a racially dual system of separate educational facilities, faculties, programs, and treatment for white and nonwhite students, the City of Vestavia Hills school system did not exist. By the time the City exercised its option under Alabama law to create a separate system, the Jefferson County school system — which students residing in Vestavia Hills attended prior to the formation of its own schools — was operating under the supervision of this Court and carrying out the desegregation orders of this Court. Vestavia Hills succeeded to the desegregation obligations of the Jefferson County system under the Court's orders, *see* Fed. R. Civ. P. 25(d), but it never itself operated a formally dual system. Although Mr. Jackson began his remarks at the fairness hearing with the assertion that the purpose of establishing a separate Vestavia Hills school system was to avoid desegregation, such a finding was never made by this Court and was not the basis for this Court's orders affecting the system. Rather, the impact of the system's formation amid the process of court-ordered desegregation — irrespective of intent — supported the Court's action. *Stout v. Jefferson County Bd. of Educ.*, 448 F.2d 403 (5th Cir. 1971), cited in *Wright v. Council of the City of Emporia*, 407 U.S. 451 (1972) (adopting "effect," rather than "intent" standard in similar circumstances).

rest of its submission or which were mentioned by Mr. Jackson at the fairness hearing.  The Court will therefore not address it independently.

28.     Racially motivated annexations.  This C.B.S. objection asserts that "[d]efendants have engaged in racially motivated annexation practices adverse to African Americans, purposed to maintain a segregated school systems with as few black students as the City of Vestavia Hills could craft."  Because this proceeding concerns whether the Vestavia Hills Board of Education, not the City of Vestavia Hills, has acted to maintain a segregated school system,[11] the objection appears irrelevant absent evidence of joint action or conspiracy between the Board and the City Council or the Legislature.[12]  The Court thus finds the objection to be based on an inadequate understanding of Alabama annexation law at times relevant to this controversy.

29.     As described in detail in the Board's answer to private Plaintiffs' Interrogatory No. 33, reprinted in doc. 20-3 at pp. 58-60,[13] there are only three methods of annexation under Alabama law: petition by owners of real property contiguous to the municipality, *see* Ala. Code § 11-42-21 (1975); referendum election following enactment of resolution by governing body of a municipality,  *see* Ala. Code §§ 11-42-2,[14] 11-42-41, 11-42-42 (1975); and by Act of the Alabama Legislature, see Ala. Const. § 104(18).  Until the decision of the Alabama Supreme Court in City of *Birmingham v. City of Vestavia Hills*, 654 So. 2d 532 (Ala. 1995), each of these methods was limited to territory contiguous to the municipality. *See id.*, 654 So. 2d at 538-39.  By the time that decision was handed down, of course, the Oxmoor Valley area, including the territory described in Attachment V to the Court's

---

[11]  Only the Board of Education, not the City of Vestavia Hills, is a defendant in this action, and while annexations by municipalities which have established separate city school systems under Alabama law carry the territory annexed into both the municipality and the school system, this does not result from actions taken by school boards.  Moreover, during the negotiations between the private plaintiffs and the defendants that led to the Settlement Agreement, counsel for the Board indicated they were willing to propose to the Board the annexation of the Oxmoor Area to Vestavia Hills if residents of the area supported deannexation from Birmingham and incorporation into Vestavia Hills.

[12]  Mr. Jackson implied at the fairness hearing that the connection could, in effect, be assumed from the fact that the Board is appointed by the City Council.  However, the Court finds that the appointment power alone, without any further evidence of agreement or control, is insufficient.

[13]  The interrogatory answer refers to an attached list itemizing areas annexed to the City of Vestavia Hills since 1970.  That list was contained on a CD furnished to counsel for the plaintiff parties.

[14]   If all of the resident electors in the area covered by the resolution file written consents to the annexation, it becomes effective without an election.  *Ala. Code* § 11-42-2(9) (1975).

1970 and 1971 Orders, had been annexed to the City of Birmingham.[15]

30.     The area described in Attachment V has never been contiguous to any portion of the City of Vestavia Hills.  Prior to its annexation to Birmingham in 1988, therefore, there simply was no mechanism by which either landowners, the City Council of the City of Vestavia Hills, or (as the law was then understood, the Alabama Legislature) could have added it to the municipal limits of the city of Vestavia Hills.   As described in the Interrogatory response, all except three annexations into Vestavia Hills, each of which took place after Oxmoor was annexed into Birmingham, have been by landowner petition,16 and the racial impact of those annexations (if any) is attributable to the demographic characteristics of the areas whose residents sought to be added to the City of Vestavia Hills.  To the extent that C.B.S. means to suggest that the City or Board had an obligation under the desegregation decrees in the Stout litigation somehow to enlarge its area so as to increase the number of African American residents and schoolchildren, the argument would appear to be foreclosed by this Court's adoption of a different form of relief (the Oxmoor Area provisions) in its 1970 and 1971 Orders.  This objection by C.B.S. is therefore not persuasive.

31.     Racial discrimination in discipline.  C.B.S. states that "[d]efendant Board of Education has engaged in racially disparate discriminatory practices in student discipline."  Although the group apparently failed to consult the substantial data on this subject that was provided and examined in the discovery process, *see supra* pp. 8-9,[17] Mr. Jackson did seek to introduce information on this subject at the fairness hearing.  This consisted of data or documents apparently secured from the website of the Alabama State Department of Education reporting incidence of discipline within the Vestavia Hills School System and the Jefferson County School system for the most recent school year available.[18]   The exhibits contained no breakdown of disciplinary actions by race, and therefore do not support Mr. Jackson's assertions that the Vestavia Hills system treats African American and white pupils differently on the basis of race or color in administering student discipline.

32.     In contrast, the plaintiff parties examined the discipline data provided

---

[15]  *See supra,* p 2, ¶ 4.

[16] One of the exceptions was the legislative annexation later challenged in the City of Birmingham litigation.

[17]  Most of these data were provided on CD.  The parties' counsel have represented to the Court that no one was contacted by any representative of C.B.S. requesting a copy of that information.

[18]  Mr. Jackson also attempted to introduce printed screens for a power-point presentation on the subject of racial disproportions (nationwide) in school discipline.  The Court ultimately declined to admit the exhibit because of its hearsay character and marginal relevance to the situation existing within the Vestavia Hills school system.

by the Board of Education in discovery and concluded that the available evidence (a) does not establish that the school district engages in racially disparate discriminatory practices in student discipline and (b) therefore does not warrant an objection to a finding of unitary status in this area.[19] The objection filed by C.B.S. and the material presented by Mr. Jackson at the fairness hearing are simply inadequate to give the Court a basis for rejecting the conclusions reached by the United States and by private plaintiffs.

33.   The "Confederate Flag" issue.  This C.B.S. objection alleged that the "Board of Education has fostered and permitted a racially hostile atmosphere by permitting the presence of the 'Confederate Flag' during athletic events."[20] Although

---

[19] *See Tasby v. Estes*, 643 F.2d 1103, 1107-08 (5th Cir. 1981) (holding that a plaintiff must prove "that the administration of student discipline in the [district] is motivated by a discriminatory purpose," and that, while "evidence of disparate racial impact may provide an 'important starting point,'" "statistical proof that black students are disciplined more frequently and more severely than white . . . students has limited probative value"). The parties' Joint Response to the Objections of the Colemans and C.B.S.  *Doc. 28* provided a recent example, summarizing information showing that, for the 2005-06 school year, 44 students in the school system were assigned to the alternative school as a disciplinary sanction.  *Doc. 20-3*, at pp. 56-57, *Resp. No. 31*.  Of that total, 39 (89%) were white and 5 (11%) were African American.  *Id.*  For the following school year, a total of 11 students were assigned to the alternative school, of whom 9 (82%) were white and 2 (18%) were African American.  *Id.*  While the frequencies exceed the system-wide proportion of African American students, the parties told the Court that in this and other instances, the Board's data on incidence of disciplinary sanctions do not reveal disparities of sufficient size as to warrant the inference that the disparities are produced by disparate treatment based on race. Plaintiffs' counsel also reported that they had examined data for infractions that are defined in a manner that incorporates a degree of subjective judgment (*e.g.*, "disobedience") and, again, found an absence of disparities so glaring as to warrant an objection to unitary status on this ground.

[20] The parties' joint Response to the Objections, *Doc. 28*, provided context for the Court:  When the high school began operating in the early 1970s, students selected as their mascot a cartoon figure much like the mascot for the University of Mississippi, and like Ole Miss, VHHS refers to its teams, students, and fans as "Rebels."  At this time, the Confederate flag was often displayed as a sign of support at VHHS athletic events. Approximately 10 years ago, however, the high school adopted a new flag that more accurately represents the school and was intended to replace the Confederate flag. That attempt was not successful, but more recently, VHHS students have adopted the new school flag, which also flies at the school stadium and is made available to students by the Board. Significantly, Confederate flags are banned from the VHHS campus, and although occasionally a student will, for instance, attempt to fly a Confederate flag from a

no specifics were given in Mr. Jackson's letter, the parties understood it to refer to the presence of Confederate flags at Vestavia Hills High School (VHHS) athletic events. At the fairness hearing, Mr. Jackson reported that he had attended (apparently in the 2005-06 school year) a Vestavia Hills High School football game held at Hoover High School, during which several Confederate flags were waved on the "Vestavia side" of the stands. Mr. Jackson was critical of the Vestavia Hills system for not having school personnel on hand at such events held at facilities other than its own, to intercept and identify individuals involved and, if they are Vestavia Hills students or staff, subject them to appropriate discipline. The Court concludes, however, that the scope of Vestavia Hills personnel's authority (if any) to do so off campus is unclear at best, as described by Vestavia Hills Superintendent of Schools Blair in his testimony at the fairness hearing, which the Court finds credible. This isolated example was the only concrete instance brought to the Court's attention, and considered in light of the parties' joint representations and the Superintendent's testimony, the Court finds it inadequate to justify withholding unitary status.

34. **Personnel practices.** C.B.S. avers that "[d]efendants have not complied with the court order creating Vestavia Hills City Schools in employment of teachers, administrators, auxiliary and support personnel, principals, assistant principals, and coaches." Mr. Jackson addressed this issue at the fairness hearing, although he provided no additional data beyond that produced in discovery. The Court concludes that Mr. Jackson's belief that the system did not meet the hiring goals of the Court's orders in this case is based upon a misunderstanding of those Orders. Specifically, Mr. Jackson emphasized the decline in the proportion of African American teachers in the Vestavia Hills school system since the relevant orders were entered. (In the 2006-07 school year, the Board employed 419 full-time teachers, of whom 405 (97%) are white and 14 (3%) are African American.) As the Court will explain, however, the orders were not violated.

The July 23, 1970 Order provided as follows:

> The Vestavia Hills Board of Education, shall, for the school year beginning September, 1970, employ seventeen (17) black faculty and staff members, which number shall by January, 1971, be increased to twenty (20) black faculty and staff members, and shall fill each available teacher or staff vacancy with a member of the Negro race until the

---

pick-up truck on a game day, the Board indicates that these isolated events are quickly dealt with, and there is no evidence they represent an intent to intimidate or to promote segregation. In addition, as a safety measure, sticks and poles are banned from athletic events on Board property, which has the effect of limiting the opportunities to display Confederate flags, although the Board cannot regulate displays of Confederate flags by attendees at sporting events located at other school systems." These representations were supported by the Superintendent's sworn testimony at the fairness hearing.

percentage of Negro faculty and staff members within the system attains
25 per cent of the total number of faculty and staff in the entire system
and shall further achieve the 25 per cent ratio by the fall semester, 1971.

(July 23, 1970 Order,  ¶4, at 3.)  The September 8, 1971 Amended Order similarly
provided that the Board "shall be required to attain a minimum of 25% black faculty
. . ." (Sept. 8, 1971 Amended Order ¶V(d), at 9), and it also required that the Board
"shall reassign its faculty and its staff so that the white-black ratio of staff and of
faculty assigned to each school is substantially the same as the ratio for staff and for
faculty in the system as a whole" (*Id.* ¶VI(a), at 9.)

35.    The interrelationship of these two provisions make evident that the
purpose of  ¶4 of the 1970 Order and  ¶5 of the 1971 Amended Order was to create,
at schools operated by the Vestavia Hills system, faculties and staffs whose racial
composition would approximate that which would have been produced by compliance
with Singleton[21] faculty assignment requirements by the Jefferson County Board of
Education, had Vestavia Hills not formed a separate system.

36.    The parties' Joint Response to the Objections indicates that the Board's
discovery responses and publicly available data reveal substantial compliance with
these requirements.  As directed by the July 23, 1970 Order, in the fall of 1970, the
school system employed 17 African American teachers,[22] and it also appears that the
Board complied with the requirement that it employ 20 African American teachers
by January 1971.[23]  For the 1971-72 school year, the school system employed at least
36 African American teachers, almost double what was required of it.[24]  In addition,
the discovery information and publicly available data strongly suggest that the Board
met "the 25 per cent ratio by the fall semester, 1971." (July 23, 1970 Order  4, at 3.)[25]

---

[21]  *Singleton v. Jackson Municipal Separate School Board*, 419 F.2d 1211, 1217-
18 (5th Cir. 1969), *rev'd in part on other grounds sub nom. Carter v. West
Feliciana Parish School District*, 396 U.S. 290 (1970).
[22]  U.S. Dep't of Health, Educ., and Welfare/Office for Civil Rights, Directory of
Public Elementary and Secondary Schools in Selected Districts: Enrollment and
Staff by Racial/Ethnic Group 1970.
[23]  *See doc. 20-3*, at pp. 29-30, Response No. 14.
[24]  *Id.*
[25]  According to the Board's response to private plaintiffs' Interrogatory No. 14,
33% of the teachers at Vestavia Hills Elementary were African American, and
24% of the teachers at the high school were African American.  Information is
missing for the remaining school in the system, and in addition, grade
configurations changed between 1970 and 1972; Pizitz Middle School may have
replaced Vestavia Hills Elementary-Civic in the 1971-72 school year.  Inasmuch
as the numbers of African American teachers in the system increased from 17 in
1970-71 to 36 in 1971-72 (111%) just for the two schools for which there is data,
while the total number of teachers increased from 117 to 131 (12%) — so that
African American teachers made up 27% of faculties at those two schools — the

15

The fact that the proportions of African American teachers in the system has fallen since that time does not violate the cited orders, because those orders did not require that any specific ratios be maintained.[26]  Nor, therefore, is the decline dispositive of the unitary-status question.  *See Fort Bend Indep. Sch. Dist. v. City of Stafford*, 651 F.2d 1133, 1140 (5th Cir. 1981) ("[W]e do not think that the fact that the district . . . has a smaller percentage of minority faculty than it did before desegregation means that the racial composition of the [district's] faculty precludes a determination that it is a unitary school district.").

37.    Unlawful Student Tracking and Assignment.  C.B.S. states that "[u]pon information and belief, Vestavia Hills has employed constitutionally unlawful student tracking and assignment systems adversely impacting black students."  The Board categorically denies the allegation, and the plaintiff parties represented to the Court that none of their discovery, which included examination of data on kinds of diplomas awarded, by race and placements in programs for gifted students, 22 indicated there was a tracking system in place.  Under these circumstances, C.B.S. simply has not presented enough to the Court to justify withholding unitary status.

38.    "The Vestavia Hills Board of Education is Segregated by Race."  No additional comment or information about the substance of this objection was provided either in Mr. Jackson's letter to the Court or in his comments at the fairness hearing, and the Court remains uncertain about its relevance.  The parties have informed the Court that the Board of Education has no African American members.  But if the record otherwise indicates that the Vestavia Hills school system has satisfied the legal standards for entitlement to a declaration of unitary status in the operation of its schools, the racial composition of its Board would not prevent the Court from granting that relief.  In their Joint Response to the Objections, the parties represented that "There is no evidence, circumstantial or otherwise, available to the[m] . . . indicating that the all-white composition of the Board reflects segregative  intent.  According to the United States Census Bureau, in 2000 the black population of Vestavia Hills was only 1.9%.[27]  The absence of an African American on the Board when African Americans comprise a minuscule percentage of the population cannot

---

data suggests strongly that the system as a whole met the 25% minimum requirement by the fall of 1971.

[26]  This is unsurprising in light of the *Singleton*-related purpose of those provisions, *see supra* note 21 and accompanying text.  *Singleton* mandates that formerly dual school systems assign faculty while under court supervision so that schools are not racially identifiable due to faculty racial composition, but it does not "freeze" district-wide ratios; rather, those ratios may change over time as a result of non-discriminatory recruitment and hiring practices.  *Carter v. West Feliciana Parish School Board*, 432 F.2d 875, 878-79 (5th Cir. 1970).

[27]  Since 2000, the City's population increased from 24,476 to 31,051 in 2006, but the Census Bureau does not report what percentage of the population was black in 2006.

support an inference of intentional race discrimination." The Court agrees, and so rejects this C.B.S. objection as a ground for withholding its approval of the settlement.

39.    Absence of Blacks on Strategic Planning Committees. This objection states, in toto, that "Few to no Blacks have served on strategic planning committees of the Vestavia Hills Board of Education." Mr. Jackson did not address the subject at the fairness hearing. The Court, therefore, is left to attempt to discern the relevance of this subject to the unitary status inquiry, dealing as it does with the Board's appointments to a purely advisory committee. *Cf. Mayor of Philadelphia v. Educ'l Equality League*, 415 U.S. 605 (1974). In the Joint Response to Objections, the parties agreed with "the Board of Education['s] represent[ation] that when it most recently conducted strategic planning, an open invitation to participate was extended to members of the Vestavia Hills/Oxmoor community. Everyone who accepted the invitation was put on a committee, and overall, 11.2% of participants in the strategic planning process were African American." On the record before the Court, therefore, this objection does not warrant withholding approval of the settlement.

40.    Recruitment of African Americans. Mr. Jackson's letter to the Court states that "Vestavia City Schools has not sought, in good faith and consistently, African American teachers, administrators, and coaches from historically black colleges, organizations and associations, both in and out of Alabama." The parties disputed this assertion in their Joint Response to Objections:

> [T]he objection is not supported by the data produced in response to the plaintiff parties' discovery requests.
>
> This information indicates (inter alia) that representatives of the school system have made recruiting visits to historically Black colleges and universities, including Alabama State University and Stillman College (Doc. 21-3, at pp. 35-37, Response to No. 21), that the system has advertise[d] in the publication Minorities & Success in an effort to recruit and hire African American certified staff, including teachers" (id. at 37, Response to No. 22), and that it "sends representatives to the program sponsored by the Alabama Department of Education entitled 'Diversity Recruitment, Preparation, and Retention Follow-Up'" (id. at 37-38, Response to No. 22). But even if this were not the case, pursuant to the proposed settlement agreement between the Board and private plaintiffs, specific recruitment efforts targeted to potential minority candidates for employment will be made: Under Section II of the agreement, titled "Recruitment of Teachers," the Board commits for six years from the settlement date "to increase the number of African American applicants for employment with the Board . . . ." Settlement Agreement at 11. Among other things, the Board agrees to "make a minimum of two recruitment visits to each Alabama Historically Black College or University (HBCU) that grants degrees in education." *Id.*

17

The Board also agrees to "retain for two years and consider as current applications from persons who voluntarily identify themselves as African American, or mixed-race, including African American." (*Id.* at 12.)

Thus, under the Settlement Agreement, the Board will take actions that are similar to those that might be ordered by the Court, were it to conclude that the school system is entitled only to partial unitary status, and that such relief should be withheld in the area of faculty recruitment and hiring, and remedial action ordered. The C.B.S. objection on this point ignores this portion of the parties' settlement and should be rejected by the Court.

41. The Court agrees with this analysis. To the extent that C.B.S. seeks even more aggressive recruiting of African American potential candidates for positions with the Vestavia Hills school system, it differs with the settling parties only with respect to "the road map to be used to achieve th[e shared] goal" of more diverse faculty and staff in the school system, *U. S. v. South Bend Cmty. Sch. Corp.*, 692 F.2d 623, 628 (7th Cir. 1982), and the Court will approve the settlement notwithstanding that difference.

42. Inadequacy of Representation. C.B.S. says that "[o]ver the course of the decree, African Americans have not had adequate representation, including the current settlement proposal; upon information and belief, no objection to the operation of Vestavia Hills's school operation has been made in the past 15 years in spite of glaring non-compliance with the original school desegregation consent decree creating the Vestavia Hills School District." As this opinion makes clear, the Court finds no basis for concluding that there has been non-compliance — glaring or otherwise — with its decrees. That is sufficient to dispose of this objection; the Court adds that in its observation, counsel for all parties in this matter have performed their obligations professionally and competently.

43. Transportation Costs. C.B.S. alleges that

Vestavia Hills' claims of "burden" of educating Oxmoor students' transportation costs are but a racial pretext. Upon information and belief, the Alabama State Department of Education transportation formula permits ALSDE to pay for bus transportation under school desegregation orders as exist in this matter. Further, Vestavia Hills is paid by ALSDE under ALSDE Education Trust Fund Foundation Program's Grade Divisor funding formula for each Oxmoor black student attending Vestavia Hills' school system (a sum far in excess of any property tax that could be collected on residential property in Vestavia Hills or Oxmoor Valley).

44. It is somewhat difficult to understand the focus of this objection, which

18

was not mentioned by Mr. Jackson at the fairness hearing, or its relevance. [28]   In the area of transportation, one of the original Green factors, the Court must determine whether there is evidence that bus routes are segregated by race, or that the Board otherwise is using transportation in a manner that promotes segregation of the school system or on a discriminatory basis.

45.    In their Joint Response to Objections, the parties advised the Court that

the Board has four uses for buses: (1) to provide transportation for students for field trips, athletic events, and other school-sponsored events, (2) to transport Special Education students, (3) to transport students who are children of school employees,[29] and (4) to transport Oxmoor students to Vestavia Hills schools.   Other than Special Education students, the only students who are transported regularly to and from their homes and their schools are African American students who live in Oxmoor.  Transporting these students is a requirement of the 1970 and 1971 desegregation Orders, and would not be provided in the absence of those Orders (or the parties' Settlement Agreement).  Plainly, transporting Oxmoor students in this manner is not segregative.

46.    The fact that the School Board has agreed to continue to shoulder transportation costs for significant numbers of Oxmoor students for up to 15 years in the future is, to say the least, inconsistent with the thrust of this objection, which fails to persuade the Court to disapprove the settlement.

47.    The situation of Oxmoor area residents who cannot afford to pay tuition.  C.B.S. asserts that "[t]he Settlement proposal does not adequately provide for Oxmoor residents who cannot afford to pay tuition to attend Vestavia Hills City schools."  For the reasons described with respect to the Colemans' objection, this complaint is irrelevant to the inquiry before the Court.  Since nothing in applicable federal desegregation law requires the Board of Education to educate Oxmoor

---

[28]  Whether transportation costs or some other consideration motivated the Board of Education to seek a declaration of unitary status, it is entitled to that relief so long as it demonstrates that it meets the legal standards established by the Supreme Court.  Indeed, "Just as a court has the obligation at the outset of a desegregation decree to structure a plan so that all available resources of the court are directed to comprehensive supervision of its decree, so too must a court provide an orderly means for withdrawing from control when it is shown that the school district has attained the requisite degree of compliance," *Freeman*, 502 U.S. at 489-90.

[29]  For example, if a teacher or staff member works at one school, and her two children attend two other Vestavia Hills schools, they can take a bus from the school where their mother works to their respective schools in the morning, and back again in the afternoon.

students following annexation of the area into the City of Birmingham, the terms upon which the Board has voluntarily agreed, in the settlement with private plaintiffs, to make enrollment opportunities available to a substantial number of those students for up to 12 years (most without tuition cost) are not a basis for a meritorious objection to unitary status.

48.     Lack of Adversarial Hearing.  Finally, C.B.S. complains that "[t]he trial [i.e., the Court], post establishment of the Vestavia Hills School System, has never conducted an adversarial hearing on the claims of defendants that vestiges of segregation and discrimination no longer exist in its school system."  The Court in this matter conducted a fairness hearing after extensive public notice, and allowed both Mr. and Mrs. Coleman and Mr. Jackson the opportunity to speak for as long as they needed. [30]  Again, as the balance of this Opinion indicates, nothing presented at the fairness hearing has persuaded the Court that further proceedings in this matter, including an adversarial evidentiary hearing, is required.  The plaintiff parties conducted substantial investigation and discovery in this matter, the results of which have been filed in the record, which supports their judgment that the school system is entitled to a declaration of unitary status, especially considering the commitments made in the Settlement Agreement. [31]

## The Settlement Agreement

49.     The settlement agreement addresses two concerns identified by counsel for the private plaintiffs during discovery: attendance of Oxmoor Area students in the Vestavia Hills school system, and recruitment of African American faculty. [32]  The agreement will allow school-age residents of the Oxmoor Area to continue to attend

---

[30]  The small number of objections from class members weighs in favor of the settlement in this matter.  *E.g., Dillard v. City of Foley*, 926 F. Supp. 1053, 1063 (M.D. Ala. 1995).

[31]  The C.B.S. objection amounts to an assertion that an adversary evidentiary hearing on the issue of unitary status, in addition to a fairness hearing, is required in this case — in other words, that this case cannot be settled without forcing the parties to go through the full-scale evidentiary presentation, with its attendant expense and commitment of time, that a settlement is intended to avoid.  As such, it ignores or contradicts the "strong judicial policy favoring settlement," *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984), and is inconsistent with the actions of many other federal courts approving similar settlements, and the Court rejects it.

[32]  It is important to note that these concerns are not shared by the  Educational Opportunities Section of the Civil  Rights Division of the Department of Justice, which is very experienced in school desegregation cases. After reviewing the voluminous documents produced in this case, the Department of Justice concluded that the Board "has complied with its desegregation obligations and federal law." *Doc. 16-3.*

Vestavia Hills schools, either tuition free, as Oxmoor Students, or by payment of tuition, as Oxmoor Tuition Students. Under these provisions, students from the Oxmoor Area could be enrolled in the Vestavia Hills school system through the 2025-2026 school year, and it is reasonable to assume that they will continue to be enrolled in the Vestavia Hills school system in significant numbers for many years to come. Consequently, approving the settlement agreement, and declaring the Vestavia Hills school system unitary, is unlikely have a segregative effect on enrollment in the Vestavia Hills school system.

50.     The settlement agreement addresses the second area of concern,  black faculty, by committing the Board to take specific steps that may reasonably be expected to increase the number of African Americans applying for teaching positions with the Board, which in turn should result in continued and even increased numbers of black certificated staff (including teachers, librarians, counselors, and other professionals) in the Vestavia Hills school system. In addition, the agreement obligates the Board for a period of time to retain for two years and treat as current any application received by an applicant who identifies her or himself as African American. Finally, the Board has agreed to maintain applicant flow data for African American applicants, including the number of such applications received, and the number of black applicants who are interviewed, or recommended for employment, or offered jobs by the Board,  or who accept an offer of employment by the Board, or who are terminated or resign. These data will be available for review by counsel for the United States and the private plaintiffs.

51.     Federal Rule of Civil Procedure 23(e) requires district court approval of settlement agreements in class actions, but the rule does not provide standards for approval. It is clear, however, that a court reviewing such a settlement agreement must determine whether the agreement is fair, adequate, and reasonable, and whether it is the product of fraud and collusion between the parties. *E.g., Bennett v. Behring Corp.,* 737 F. 2d 982, 986 (11th Cir. 1984);  *Pettway v. American Cast Iron Pipe Co.*, 576 F. 2d 1157, 1169 (5th Cir. 1978)(Title VII case)[33], quoting *Cotton v. Hinton*, 559 F. 2d 1326, 1330 (5th Cir. 1977); *Knight v. State of Alabama*, 469 F. Supp 2d 1016, 1031-32 (N.D. Ala. 2006)(desegregation case). In making this determination, the Court has taken into consideration the record of this case, including specifically the motion to be declared unitary, the motion to approve the settlement agreement, the responses to the Court-ordered notice, the reply by the settling parties to these responses, the declarations of Norman Chachkin and Dorman Walker, the July 27, 2007 letter from the United States Department of Justice, the testimony and evidence received at the fairness hearing, and the affidavits submitted to show compliance with the Court's requirement for the settling parties to publish the text of the settlement agreement and other related documents.

---

[33]   In *Bonner v. City of Pritchard*, 662 F.2d. 1206, 1209 (11th Cir. 1981)(*en banc)*, the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down before October 1, 1981.

52.     There is no evidence that the settlement agreement is the result of fraud or collusion between the settling parties. No one who filed a response to the notice, or who spoke at the fairness hearing even so much as suggested that the agreement is anything other than the result of arms length negotiation between motivated parties and their experienced and able counsel. Indeed, the very restriction that the Colemans' complained about supports this conclusion, to the extent it indicates that the terms of the agreement are the result of compromise between parties with different and opposing views.  The Court finds that the settlement agreement is not the result of fraud or collusion.

## CONCLUSIONS OF LAW

1.     District courts in the Eleventh Circuit have used a number of criteria to evaluate whether a settlement is fair, reasonable and adequate. *E.g., Knight v. State of Alabama*, 469 F. Supp 2d 1016, 1032-37 (N.D. Ala. 2006); *Bragg v. Bill Heard Chevrolet*, 2006 U.S. Dist. Lexis 60938, *7-11 (M.D. Fla. 2006), *Warren v. City of Tampa*, 693 F. Supp. 1051, 1055 (M.D. Fla. 1988). These, in turn, are derived from guidance provided in appellate cases. *E.g., Cotton v. Hinton*, 559 F. 2d 1326, 1330-31 (5th Cir. 1977), *In re Corrugated Container Antitrust Litigation*, 643 F.2d. 195, 212-13 ((5th Cir. 1981). In general, a court considers (1) what class member will receive under the settlement compared to the range of likely recovery following a successful trial, (2) the complexity, expense, and duration of the litigation, (3) the judgment of case counsel, (4) the stage of the proceeding when the settlement was reached, and (5) the extent and substance of opposition to the settlement by class members.

2.     What class member will receive under the settlement compared to the range of likely recovery following a successful trial. Counsel for the private plaintiffs has candidly stated his belief that it would have been extremely difficult, if not impossible, for Oxmoor Area students to have retained the right to attend Vestavia Hills schools if the case had been litigated.[34]  With regard to African American faculty, the obligations imposed on the Board by the settlement agreement closely approach what the Court could have ordered had the case been tried and the Board been found liable in this area.

---

[34]  The fact that the private plaintiffs might not have prevailed on this issue if the case had been tried has no bearing on the Board's obligation to comply with the settlement agreement.  Once approved by the Court, the agreement becomes an order of the Court, no less binding and mandatory for the parties than any other Court order.  Thus, for the duration of the agreement and consistent with its terms, the Oxmoor Area will continue to be a judicially enforceable part of the attendance zone for the Vestavia Hills school system, and students attending Vestavia Hills schools from the Oxmoor Area shall be entitled to the same rights, privileges, and opportunities as are allowed to other similarly situated students attending Vestavia Hills schools.

3.      Complexity, expense, and duration of the litigation. Counsel represented that over 20,000 pages of documents were produced in discovery, covering many aspects of the Board's operations at each of its seven schools, and involving the activities of thousands of students over the course of many years. The Court is convinced that a trial of this case would have been lengthy, complicated, complex, and would have involved testimony by many lay and expert witnesses. Such a trial would have been costly in terms of money, and in terms of its impact on the local community.

4.      The judgment of case counsel.  In *Cotton*, the former Fifth Circuit held that the trial court is "entitled to rely upon the judgment of experienced counsel for the parties," and that in the absence of fraud or collusion, it "should be hesitant to substitute its own judgment for that of counsel." *Id.*, 559 F. 2d at 1330,  as quoted in *Bragg*, 2006 U.S. Dist. Lexis 60938 at *9;  *accord*, *Knight*, 469 F. Supp. 2d at 1032 ("The Court, however, should be hesitant to substitute its own judgment for that of counsel."); *Beavers v. American Cast Iron Pipe Co.*,  164 F. Supp. 2d 1290, 1297 (N.D. Ala. 2001)(in determining the fairness of a settlement, the trial court "'should be hesitant to substitute its own judgment for that of counsel'"). Counsel for the private plaintiffs and the Board, both experienced in school desegregation litigation, have told the Court that the settlement agreement is a win-win for both parties. Docs. 19 and 20. The Court believes counsels' opinions are formed on the basis of experience in school desegregation cases and  knowledge of the particular facts of this case, and are authoritative. *Warren v. City of Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988)("The Court is affording great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation. Each has stated his belief that the proposed settlement is a fair compromise.").

5.      The stage of the proceeding when the settlement was reached.  As indicated, in response to discovery requests by the private plaintiffs and the United States, the Board produced voluminous amounts of discovery, including over 20,000 pages of documents (and without a single discovery dispute). Sufficient information was produced that the United States was able to conclude that the Board had "complied with its desegregation obligations and federal law." Doc. 16-3. Obviously, sufficient information was produced to allow the private plaintiffs to form a reasonable judgment about the possible merits of the case. *Knight*,  469 F. Supp. 2d at 1033.

6.      The extent and substance of opposition to the settlement by class members. The Court has discussed in detail the extent and substance of opposition to the settlement agreement.

## CONCLUSION

For these reasons, the Court approves the settlement agreement, and declares that the Vestavia Hills Board of Education is unitary, and dismisses this action with prejudice, with each party to bear its own cost, expenses, and fees, except that the settling parties shall be bound by the terms of the settlement agreement over which the court retains jurisdiction and which cannot be modified absent a written court order.

**DONE** and **ORDERED** this the 13th day of December, 2007.


**VIRGINIA EMERSON HOPKINS**

United States District Judge